IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

ROXANNE REYNOLDS, RODNEY WARE,
and EDWARD "TYLEE" WILLIAMS,

     Plaintiffs,

v.

JUDICIAL CORRECTION SERVICES, INC.,
STEVEN RAYMOND, and CITY OF
CLANTON,

     Defendants.

2015 MAR 12  P 12: 59

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

2:15-CV-00161-MHT-CSC

COMPLAINT

JURY TRIAL DEMANDED

## I.    PRELIMINARY STATEMENT

1.    This case is brought under the Racketeer Influenced and Corrupt Organizations Act (RICO) and other laws to stop the defendants—Judicial Correction Services, Inc. (JCS); Steven Raymond, a JCS employee; and the City of Clanton—from continuing to operate a racketeering enterprise that is extorting money from impoverished individuals under threat of jail and from misusing the criminal justice system and probation process for profit. The Plaintiffs— three Clanton residents who have been harmed by Defendants' actions—also seek to void the contract between JCS and the City that is at the heart of the scheme. The Plaintiffs seek damages for the injuries they have suffered, including treble damages under RICO and punitive damages to punish the Defendants and deter others from similar misconduct.

2.    Plaintiffs Roxanne Reynolds, Rodney Ware, and Edward "Tylee" Williams are residents of Clanton, Alabama. During the times relevant to this action, each had very limited income, making it impossible for them to pay the fines and court costs assessed on tickets in the Clanton Municipal Court. Each was placed on "pay-only probation" with a private for-profit

company, Defendant JCS. Each was required by JCS to pay a monthly fee for JCS's own profit, in addition to payments owed to the municipal court. Each struggled mightily to pay the amounts demanded, under repeated direct and indirect threats by JCS employees that if they did not do so they would be incarcerated. Their ability to come up with the money varied—Ms. Reynolds and Mr. Ware were ultimately able to do so by skipping meals, stopping paying other bills, and taking out high-interest predatory loans, but Mr. Williams could not do so, and ultimately was incarcerated and had to "sit out" in jail the amount he owed, receiving a credit of $50 for every day served. Neither JCS nor the Court ever told Plaintiffs that they could request a lower monthly payment; that they could request to have the JCS monthly fee waived, or that the amount they could legally be required to pay had to correlate to their actual ability to pay. Because of these intentional omissions, the Plaintiffs genuinely believed (and Mr. Williams directly experienced) that if they failed to pay the money demanded, they would be incarcerated.

3.     The actions of Defendant JCS and Raymond constitute racketeering under RICO. They are part of a RICO "enterprise" comprised of them, the City of Clanton, and the Clanton Municipal Court, with a common purpose of maximizing the collection of court fines, court costs, and fees to JCS without consideration of the individual's ability to pay. Through this enterprise, Defendants JCS and Raymond extort pay-only probationers through the threat of incarceration to ensure that JCS receives its probation fees, in violation of the RICO predicate acts of extortion under the Hobbs Act, the Travelers Act, and Alabama law. Defendants' actions further constitute abuse of process under Alabama law.

4.     Defendant JCS facilitated this arrangement by negotiating a contract with Defendant City of Clanton in 2009. This contract creates an exclusive franchise on behalf of JCS to provide "probation" services to the Municipal Court, but was not publicly bid. The

Alabama Constitution and the Alabama Competitive Bid Law require exclusive franchises to be bid, and the contract is therefore void.

5.      The contract between JCS and the City of Clanton is also illegal and void because it is contrary to public policy. The contract mandates that JCS shall collect a set-up fee of $10 and a monthly fee of $40 from every person placed on probation with JCS, but Alabama law does not permit the collection of a fee for municipal court probation.

## II.      JURISDICTION AND VENUE

6.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 18 U.S.C. § 1964(c) (RICO). The Court has supplemental jurisdiction over the state law causes of action asserted in this Complaint pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as the federal law claims.

7.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

## III.      PARTIES

**A.      Plaintiffs**

8.      Plaintiff Roxanne Reynolds is a resident of Clanton, Alabama.

9.      Plaintiff Rodney Ware is a resident of Clanton, Alabama.

10.     Plaintiff Edward "Tylee" Williams is a resident of Clanton, Alabama.

**B.      Defendants**

11.     Defendant Judicial Correction Services, Inc. (JCS) is a foreign corporation principally located in Georgia. Defendant JCS is incorporated in Delaware. Defendant JCS is and was doing business in Chilton County, Alabama during all times relevant to this action, pursuant to a contract with the City of Clanton to provide "probation" services and to collect

3

fees, fines, restitution, and costs for the Clanton Municipal Court.

12. Defendant Steven Raymond is and was the Supervisor for JCS's office that covers the jurisdiction of Clanton, Alabama during all times relevant to this action. In his role as Supervisor, Defendant Raymond was instrumental in devising, overseeing, and enforcing JCS's policies at issue in this action. Defendant Raymond is sued in his individual capacity.

13. Defendant City of Clanton is a municipal corporation located within Chilton County, Alabama.

14. Defendants JCS and Raymond are referred to collectively in this pleading as the "Private Probation Defendants."

15. Defendants JCS and the City of Clanton are referred to collectively in this pleading as the "Contract Defendants."

## IV. STATEMENT OF FACTS

### A. Structure of RICO Scheme to Extort Persons Appearing in Clanton Municipal Court by the Private Probation Defendants

i. Background on Structure and Operation of the Clanton Municipal Court

16. The Clanton Municipal Court has a single part-time judge named John Hollis Jackson, III.

17. The Clanton Municipal Court typically conducts judicial court proceedings one day per week, on Tuesday afternoons.

18. The Clanton Municipal Court's judicial court proceedings are closed to the public. To enter the court, a person is required to have a case or hearing in front of the Municipal Court in order to enter into the courtroom. The City allegedly adopted a new policy on March 9, 2015, to open the Courthouse to the public when space was available, and to display an audio and video stream of the courtroom in an overflow area, but on March 10, 2015, none of these new

4

policies were actually implemented.

19.   The Clanton Municipal Court was and is closed to the public pursuant to the direction of Municipal Court Judge Jackson.

20.   The Clanton Municipal Court's judicial court proceedings are not recorded and are not transcribed.

21.   The Clanton Municipal Court is authorized to hear cases involving city ordinance violations, including traffic tickets and misdemeanors, which occur within the city's police jurisdiction.

22.   Defendant City of Clanton does not operate a municipal jail. It contracts for jail services from the Chilton County Sheriff's Office. Individuals in the County Jail who have a hearing in Municipal Court generally are not transported to appear in person. They instead appear in Municipal Court through a video display, while remaining physically within the jail.

        ii.   Contract between Defendant JCS and Defendant City of Clanton for "Pay-Only Probation" Services

23.   Defendant JCS first contracted with Defendant City of Clanton on February 9, 2009. Under the contract, JCS collects payments of fines, costs, fees, and restitution assessed by the Clanton Municipal Court, through the practice of "pay-only probation"—probation imposed for the sole purpose of collecting fines and fees from those who cannot afford to pay in full.

24.   Defendant City of Clanton did not put out a request for bids or otherwise advertise and solicit bids for probation services prior to executing the contract with Defendant JCS in 2009.

25.   Defendant City of Clanton has not put out a request for bids or otherwise advertised and solicited bids for probation services after executing the contract with Defendant JCS in 2009.

5

26.     One publicly stated purpose of Defendant City of Clanton's contract with Defendant JCS was to reduce jail costs for the City of Clanton and allow the City's Municipal Court Judge the option to have defendants pay fines over a probationary period in lieu of being placed in jail.

27.     The contract provides that JCS's services will be cost-free to Defendant City of Clanton.  Specifically, it provides that "JCS agrees that it will not invoice the City or Court for its services. In consideration of the probation services provided by JCS, the Court agrees that each Court Order shall provide for the following:

> 1. Probation fee of $40.00 per month flat fee. (Basic or intensive supervision)
>
> 2. One time probationer set-up fee of $10.00. . . ."

28.     The contract is exclusive, providing that "JCS will supervise all probated cases sentenced by the Court."

29.     The contract states that "JCS will also supervise indigent cases when determined by the Court. These cases will not be charged the standard probation fee, but will still be offered all JCS services."

30.     The contract automatically renews each year unless one party gives notice prior to 30 days before the expiration date.

31.     Pursuant to this contract, JCS operates an office where persons assigned to report to JCS must meet with JCS staff.  When the contract was initially negotiated with Clanton in 2009, JCS's closest office was in Columbiana, which is over 25 miles away from Clanton.  In May 2011, JCS opened another office in Jemison, which is over 11 miles away from Clanton. JCS presently operates an office in the Clanton Municipal Court as well, but it requires persons assigned to JCS to initially report to its office in Jemison (and before then, Columbiana), and

almost always requires that persons continue reporting to these offices instead of that located within the Clanton Municipal Court building.

    iii. Characterization of JCS staff as "Probation Officers"

  32. JCS employees refer to themselves, and are referred to by the Clanton Municipal Court, as "Probation Officers" when communicating with Clanton Municipal Court defendants. Neither JCS nor the Municipal Court discloses that JCS is a private for-profit company.

  33. JCS has a logo which is designed to appear like a law enforcement badge; this logo appears on JCS business cards, receipts and paperwork given to pay-only probationers, and on its sign outside of its offices.

  34. As described in greater detail below, JCS supervises Clanton Municipal Court defendants pursuant to an "Order of Probation" entered in each case.

  35. JCS employees in fact do not perform functions typically associated with probation officers. Specifically:

    a. JCS employees are not authorized to carry weapons.

    b. JCS employees are not authorized to make arrests.

    c. JCS employees in Clanton do not perform typical probation-related services, such as helping individuals seek social services, monitoring travel, and ensuring that they comply with other probation conditions such as not committing any other crimes.

    d. JCS employees do not provide services related to searching for a job or preparing resumes. JCS does maintain a "Job Board" within its office, but it rarely has new advertisements, and is sometimes empty, containing only a sign asking persons reporting to JCS to post jobs to the board if they know of any.

  36. Collection of money is the primary duty of JCS employees. JCS employees use a

7

computer system to track their cases and their work, and their primary screen when they log into the computer has measures that indicate the amount of money collected by that employee during this month, the amount of money that employee should have collected on cases during this month, the employee's progress toward her monthly goal, and the number of cases that have had no payments in 40 days.

iv.    Initial Adjudications in Clanton Municipal Court and Assignment to "Pay-Only Probation" with JCS

37.    The practice of the Clanton Municipal Court is very standard.    When an individual appears on a traffic ticket or misdemeanor and receives an adjudication that includes a fine and/or court costs, the Municipal Court Judge's practice is to ask whether the person wants to pay today or be put on a payment plan.

38.    The Clanton Municipal Court Judge or other court staff asks the same question of individuals whose cases have been dismissed, nol prossed, or continued but who are required by the court to pay court costs or restitution.

39.    Community service is an option for some Clanton Municipal Court defendants, but is not generally disclosed to defendants.    Rather, if a defendant asks for community service, the Municipal Court Judge will decide whether to grant this request in lieu of paying the fine.

40.    Clanton Municipal Court defendants are not provided with appointed counsel during most Municipal Court proceedings, particularly when the sentence imposed does not involve immediate incarceration.

41.    The Clanton Municipal Court Judge does not inform defendants of their right to not be jailed if they cannot afford to pay the fine, costs, fees, and restitution in whole or in part.

42.    Court costs in the Clanton Municipal Court vary depending on the crime, but are often hundreds of dollars per charge or per traffic ticket.

8

43.     The Clanton Municipal Court has a policy and practice of charging court costs on each ticket or charge, notwithstanding Alabama law providing that costs should generally be charged only once per incident. It also routinely assesses court costs and fines above the amounts outlined in statute and in the Rules of Judicial Administration.

44.     If a Clanton Municipal Court defendant does not have the ability to pay the full amount owed and therefore requests a payment plan, he or she is told to visit JCS's office in the courthouse.

45.     The Clanton Municipal Court makes no effort to determine the defendant's income, expenses, or the amount that the individual can afford to pay each month before sending the individual to speak to JCS.

46.     The service provided by JCS is referred to by the municipal court and by JCS as "probation."

> v.     Completion of the JCS-Created "Order of Probation" for Clanton Municipal Court Defendants Assigned to Pay-Only Probation

47.     JCS fills out an "Order of Probation" for each Clanton Municipal Court defendant assigned to it. This Order of Probation form is a standard document that was created by JCS.

48.     Many terms in the Order of Probation are fixed and cannot be modified. These include that the person assigned to JCS will:

    a.     "make a full and truthful report to your [JCS] Probation Officer as instructed";

    b.     "pay Judicial Correction Services, Inc., $40 for each month on probation";

    c.     "Pay a one time $10.00 file set up charge";

    d.     "not change . . . residence or employment without first notifying [the JCS] Probation Officer";

9

e. "avoid injurious or vicious habits and not violate any law(s) during said term of probation";

f. "work diligently at a lawful occupation, unless a full time student"; and

g. "promptly and truthfully answer all inquiries . . . by . . . [a JCS] Probation Officer and comply with all instructions he/she may give [the person assigned to JCS]."

49. Other portions of the Order of Probation are completed by the JCS employee. These include:

a. the length of the term of probation, which is always set to 24 months;

b. the amount of money to be paid per month by the person put on probation; and

c. the first "appointment" at which time the person assigned to JCS must report to the JCS office in Jemison (and previously, Columbiana).

50. In the Order of Probation, the JCS employee specifies an amount to be paid per month by the person assigned to JCS. This amount is set by JCS policy as follows:

a. JCS unilaterally sets the amount owed each month without consulting with the Clanton Municipal Court Judge;

b. JCS does not evaluate the individual's ability to pay before completing the Order of Probation and setting the monthly payment; and

c. The amount owed each month is based on a standard payment schedule for the Jemison/Clanton JCS office. This standard minimum payment for that office is at least $140. This standard minimum payment includes the $40 monthly fee collected by JCS, and the remainder is to be paid to the Clanton Municipal Court.

51. The Order of Probation further warns, in bold, that **"You are subject to arrest**

for violation of any condition imposed by this order, and your probation may be revoked accordingly."

52.   The Order of Probation must be signed by the person assigned to JCS.

53.   The Municipal Court Judge generally never speaks to persons assigned to JCS about the terms of the Order of Probation, other than to tell them that they are going to be given a "payment plan" with JCS.

54.   JCS employees also request contact information for family, friends, and employers of the pay-only probationers.

### vi.   Apportionment of Money Collected Between JCS and the Clanton Municipal Court

55.   Pursuant to JCS policy, JCS retains $40 from each monthly payment of at least $140, and it retains an extra $10 from the first payment for a set-up charge. The remainder is to be paid to the Clanton Municipal Court.

56.   Neither the contract nor the Order of Probation specifies how the money is to be allocated if JCS accepts less than $140 from the individual.

57.   In practice, if a person assigned to JCS pays less than $80, JCS retains at least half of the amount to pay toward JCS's monthly fee, and applies the remainder to pay toward the person's debt to the Clanton Municipal Court.

58.   The Clanton Municipal Court does not have any way to audit the money collected by JCS. JCS maintains records within its own system and provides a receipt to individuals who make a payment, but the Clanton Municipal Court is informed of the money it receives from JCS only; the Court is never informed of the actual amount paid by the pay-only probationers.

### vii.   Requirements to Report to JCS

59.   Individuals assigned to JCS must report to JCS at least every 30 days.

60.    These meetings are in person, usually at the JCS office in Jemison (formerly Columbiana).

61.    The primary purpose of these meetings is to collect JCS's fees and additional money for court costs and fines and to threaten individuals who are unable to pay enough money.

62.    In keeping with that primary purpose, JCS permits pay-only probationers to send someone else on their behalf to these meetings, so long as a sufficiently large payment is received.

63.    If an individual falls behind on payments, that person is required to meet with JCS in person, and often is required to meet with JCS weekly. Persons must meet with JCS more than once a week if their payments are particularly small. During these meetings, they are repeatedly told that they must pay more, and that they can be incarcerated if they do not do so.

64.    Individuals who inform JCS that they cannot pay the amount required because they are unemployed or because they do not make enough money are told by JCS that this is not a valid excuse. They are further told to come back next time with the money owed, and are threatened with being incarcerated if they do not pay the amount demanded.

65.    Employees at JCS will regularly tell persons under their supervision that they must bring money when they report, and that there is no point in showing up without any money. Yet they will also note the person as having "missed" the appointment when they do not appear.

66.    When appointments are missed, JCS employees regularly call all contacts listed for the individual, including employers, emergency contacts, and family, to try to coerce the person to come to JCS and to bring money.

67.    When appointments are missed, JCS often will set multiple appointments on the same day or within two days, without ensuring that the individual knows about these new

12

appointments. JCS marks all of these new appointments as "missed" in their records, which JCS will then later report to the Clanton Municipal Court if JCS seeks to revoke probation.

68.     If a person does not appear, or does not make sufficient payments to satisfy JCS, JCS employees will prepare paperwork to revoke the probation.

viii.     Probation Revocation Process

69.     When JCS initiates its revocation process, it takes the following steps, pursuant to company policy.

70.     The JCS employee sets a court revocation hearing date. This hearing date is specified by JCS without the involvement of the Clanton Municipal Court, and the Municipal Court is not informed that a hearing has been set. Rather, during every court date the Municipal Court asks JCS if JCS has any cases to be heard that day; if JCS reports that it does, the case is then called. This is the first time that the Municipal Court learns of the hearing.

71.     After setting a revocation hearing date, JCS policy requires that the JCS employee is to send a letter to the individual by regular mail, though sometimes this letter is given directly to individuals when they are at the office reporting. The employee calculates the amount of JCS fees owed and court fines and costs owed. This amount is reported in the letter sent or given to the individual.

72.     This letter does not advise the pay-only probationer that the ability to pay is a critical issue in the proceeding. This letters does not instruct the individual about what to do if she is unable to pay. This letters does not inform the individual that she cannot be incarcerated if she is unable to pay.

13

73.     The JCS employee is authorized by JCS to negotiate with the individual regarding how much money to accept in order to cancel the revocation hearing. In practice, this often results in the hearing being cancelled as a result of a partial payment being received.

74.     When the hearing is cancelled based on a payment from the pay-only probationer, the Clanton Municipal Court is never informed about the hearing, and nothing is filed in the court docket indicating that a probation revocation hearing had been set and was cancelled.

ix.     Revocation Hearings

75.     If the pay-only probationer has not made a sufficient payment in advance of the hearing date and appears for the hearing, the JCS employee attempts to collect the amount outstanding or to negotiate a lower amount with the individual before the case is called. If this is unsuccessful, then the case is called in front of the Municipal Court Judge.

76.     During the hearing, JCS employees make no mention of any information that they have learned from the individual about why she is unable to pay. The JCS employees simply report the amount of money still owed, and any other violations such as missed appointments. The JCS employees also request that the person be taken off of JCS and "sit out" their fine in the County Jail.

77.     During the hearing, no indigency determination is conducted, and Municipal Court Judge Jackson does not routinely inquire into the person's ability to pay. However, if a person pleads a hardship, Judge Jackson will sometimes require JCS to consider this, utilizing a form referred to in this pleading as a "JCS Affidavit of Hardship" (described below). Judge Jackson will sometimes then lower the monthly payment, but will typically still require the person to continue paying JCS its $40 monthly fee.

78.     If the Municipal Court Judge decides to end probation, the Judge will often

14

require that the individual serve time in the Chilton County Jail until the amount owed is paid off, with the person being given a "credit" of $50 per day served toward the amount that is owed. Thus, if a person owes $500, she will serve 10 days in jail unless the person can arrange for family or friends to pay the amount that is outstanding.

79.     If the individual does not appear at the court hearing, the Municipal Court Judge orders that an arrest warrant should issue. The arrest warrant, signed by a Magistrate, specifies a cash bond of the amount owed (in the above example, $500), and states that probation was revoked. After arrest, officials at the jail will inform the person that, if this bond is not paid in cash, the person will serve time in jail until the amount owed is paid off, with the person receiving a credit of $50 per day (in the above example, 10 days).

          x.     <u>JCS Affidavits of Hardship</u>

80.     The Jemison/Clanton JCS office possesses a document whereby the person on probation can request that her payment be lowered. This document will be referred to herein as the "JCS Affidavit of Hardship."

81.     JCS does not generally inform pay-only probationers that the JCS Affidavit of Hardship exists.

82.     JCS uses the JCS Affidavit of Hardship only when the JCS employee decides that sufficient exigent circumstances exist to warrant its use or when ordered by the Municipal Court Judge to use it.

83.     Pursuant to company policy, there are two categorical reasons to consider creating a waiver for payments: If a person is in the hospital for an extended period of time (referred to as a "Medical Hold"), and if the person is incarcerated for more than 30 days (referred to as a "Jail Hold").

84.    Per company policy, JCS does not consider unemployment, lack of income, or mere sickness sufficient to justify using the JCS Affidavit of Hardship or to otherwise lower or suspend one's payments.

85.    When individuals report to JCS that they have very small or no income, JCS employees do not advise individuals about the JCS Affidavit of Hardship, nor do they advise individuals that they may be able to lower their payments or obtain a waiver of monthly fees.

86.    Individuals who learned from others about the JCS Affidavit of Hardship and ask for it, or who ask for a lower monthly payment because they do not have sufficient income, are told by JCS employees that this is not an option available to them.

**B.    Individual Plaintiffs' Experiences**

i.    Plaintiff Roxanne Reynolds

87.    Plaintiff Roxanne Reynolds is a 49-year-old Caucasian woman who resides in Clanton, Alabama.  Ms. Reynolds has resided in Clanton since she was born, and started her own family and raised three children in Clanton.

88.    Ms. Reynolds received tickets for a burned out headlight, driving without insurance, and driving with a suspended license in late 2012.   She was arrested on about February 15, 2013, after missing her original court dates on these tickets because she could not get time off from a new job she had just started.  Ms. Reynolds spent four days in the Chilton County Jail before she was brought before Judge Jackson via videoconference on about February 19, 2013.

89.    Ms. Reynolds did not have an attorney to represent her at this hearing, and Judge Jackson did not ask if she wanted an attorney to be appointed for her.

90.    She pled guilty to the traffic tickets and was fined $520, assessed $662 in court costs, and received additional fees of $450 for her original failure to appear. She received no credit for the days she spent in jail. Judge Jackson asked if she could pay the amount owed that day, which was $1632 total, or if she wanted a payment plan. When Ms. Reynolds stated that she was unable to pay, Judge Jackson told her that Defendant Raymond, who was in the room with her, would set up the payment plan. Judge Jackson did not ask about her ability to pay or about how much she could afford each month, and did not offer her the option of community service. Judge Jackson did not discuss the terms of being assigned to JCS, did not explain that the Order of Probation would require an additional monthly payment of $40 (plus an initial $10 set-up fee) or explain that she was being put on "probation." Judge Jackson did not speak to Ms. Reynolds again on that day.

91.    Ms. Reynolds spoke with Defendant Raymond in another room in the jail. Defendant Raymond told her that she was on probation and must bring $145 each month to JCS's Jemison office. Defendant Raymond did not ask Ms. Reynolds anything about her income, resources, or costs and expenses, and did not tell her that the monthly amount could be set lower or that the fee could be waived depending on her ability to pay.

92.    Defendant Raymond handed Ms. Reynolds a document that told her to report on February 25, 2013, less than one week from that date, and that she must bring "no less than $145 to be applied to your fines and fees." It further stated that "Failure to report as directed may result in a warrant being issued for your arrest," and that there were "**NO EXCUSES**." (Emphasis in original). This document also warned, "**Do not contact the Municipal Court**, they will be unable to help you." (Emphasis in original).

93.    Ms. Reynolds struggled to make the appointments and payments set by JCS. The

17

office was more than 25 minutes away from her house and more than 20 minutes from her work. Her license had been suspended based on a mistake with her child support, but she was unable to pay the fees for reinstatement. She also did not have enough money to pay for gas and her monthly JCS payments.

94.    Ms. Reynolds would often have a friend go to JCS's Jemison office to make payments for her. This friend would use his own money to pay, and she would pay him back what she could at a later date.

95.    Ms. Reynolds was experiencing a great deal of physical pain during this time. A few months after she was sentenced to probation with JCS, Ms. Reynolds was diagnosed with multiple sclerosis. On her doctor's orders, she was required to take time off from work to treat this condition.

96.    Ms. Reynolds worked as an assembly technician, assembling automotive parts. However, she often had to take significant time off of work due to her continued pain and poor health. She also had 25% of her wages garnished beginning in February 2013 due to a high-interest car loan that she co-signed for her ex-husband many years ago and that he had stopped paying.

97.    Ms. Reynolds could not legally drive herself to work because of her suspended license. But there was no public transportation available; Ms. Reynolds contacted the Chilton County Transit system, but was told that there was a waiting list of over four months to reserve a trip on their bus service. She also could not afford to pay or consistently find other people to give her a ride. Thus, she often had to walk approximately six miles to a major road, where she could flag down her coworkers to give her rides to work. She missed work on a few occasions when she could not get a ride.

98.     Desperate to try to raise more money, Ms. Reynolds even rented rooms in her house to others. This proved disastrous, as the tenants failed to pay her and left her with a higher utility bill.

99.     When she reported to the JCS office, Ms. Reynolds would wait in the waiting room for often up to 20 minutes before being called back to speak with a JCS employee. The meetings themselves were brief. She would hand the employee her payment, and, if she had not brought her full monthly payment, the JCS employee would tell her she had to bring more, and give her another appointment within a week.

100.    Each time she would bring a partial payment and Defendant Raymond was present, he would tell her that she had to make her $145 payment or go back to court, where the judge would send her to jail.

101.    Ms. Reynolds tried to send friends to report for her as much as possible, because of her difficulty in getting to the office and because she was scared by Defendant Raymond's threats. As long as her friends were bringing sufficient money to JCS, JCS employees did not object to this arrangement.

102.    No JCS employee ever asked Ms. Reynolds any questions about her life, her financial situation, or why she was struggling to make any payments during these meetings. When they asked her for more money, Ms. Reynolds tried to explain her health problems and difficulty with transportation to Defendant Raymond and the other probation officers. Defendant Raymond would continue to threaten her and tell her that this was no excuse, because everyone had health problems from time to time.

103.    On Monday, January 20, 2014, Ms. Reynolds made a partial payment of $15, of which $5 was applied to her JCS fees. She was $45 in arrears on JCS's monthly probation fee.

Defendant Raymond interrupted the meeting that Ms. Reynolds was having with Ms. Tonia Hamby, a JCS employee. He read down the list of dates in Ms. Reynolds' electronic file, noting where she was a "no show" or where she made no payment or only a partial payment. Defendant Raymond handed her a probation revocation letter while she was in the office stating that she owed $767—$722 to the Court, and $45 to JCS—and told her that she needed to bring at least $150 by the end of that week or else her probation would be revoked. Ms. Reynolds was crying and again tried to explain her health condition. Defendant Raymond told her that he did not want to hear about it, and told Ms. Hamby that they were going to "stop this 'no money' going on."

104. The revocation paper that Ms. Reynolds was handed contained numerous misstatements or omissions. It stated that she "has failed to report 12 of 12 set appointments and has not made payments as ordered," but failed to note that she had reported to the office on many times between the final twelve dates listed. Moreover, Ms. Reynolds received no notice of most of these appointments—many of which were only one or two days apart. The petition further states that she "has not responded to calls or letters," suggesting that she was being entirely non-responsive, but failed to note that she was in the office when they created this letter and handed it to her. The letter said that her court date would be February 11, 2014.

105. Ms. Reynolds was terrified of going back to jail, especially because of the risk of losing her job and the pain she experienced while in jail last time due to her health condition. She did not buy groceries and barely ate that week to save up the money to pay by Friday, and fell behind on other bills due that month. She made the $150 payment on Friday, of which JCS retained $45 to cover the probation fees in arrears and sent $105 to the Municipal Court.

106. After JCS received her money, JCS cancelled her February court date. No copy of the revocation petition was entered into her court file. The Municipal Court, however, entered

an order *in absentia* modifying her probation on February 4, 2014, stating that Ms. Reynolds was "now compliant," but adding four days to her probation term, for a total of 24 months and 4 days. Neither the Municipal Court nor JCS informed Ms. Reynolds of this order nor the extension of the probation term, which was entered in violation of the statutory limit of two years for all probation terms in municipal court. *See* Ala. Code § 12-14-13(a).

107.    Ms. Reynolds obtained three additional tickets during one traffic stop in 2014, for driving while her license was revoked, for failing to display insurance, and for an expired tag. She was terrified of adding more tickets and another two-year probation term to her current JCS probation, and thus brought almost her entire income tax refund to the Municipal Court to pay off two of the tickets in February 2014. She took out a high-interest loan to pay the remaining ticket two weeks later.

108.    After the incident in January, Ms. Reynolds had a friend take the next few payments to JCS because she was too scared to report. She stopped paying other bills and had her power cut off to make her full monthly payments. On May 5, 2014, she reported to the JCS office herself and made her final payment to JCS.

109.    Because of this probation, Ms. Reynolds was forced to report regularly to the JCS office for approximately 15 months, between February 2013 and May 2014. In addition to her court fines and fees, she paid JCS approximately $610 over that time.

110.    Ms. Reynolds still struggles with her health and lives paycheck to paycheck, often failing to pay all of her bills each month. If she were to receive any tickets in the City of Clanton, she would be unable to pay them immediately and fears returning to JCS.

111.    During her time on JCS, Ms. Reynolds was never told that she could lower her payment or seek to have the JCS fee waived because of her financial status, even though she told

JCS employees repeatedly that she had very limited income, due in part to her medical condition. JCS never offered Ms. Reynolds assistance in finding a better job.

112.    During her time on JCS, Ms. Reynolds felt compelled to pay the set-up fee and the monthly fee charged by JCS out of fear that if she did not do so, she would be incarcerated. She further feared that if she did not pay the amount owed, that JCS would initiate a probation revocation hearing against her (as they did in January 2014), and that at that hearing JCS would not tell the Judge anything about her efforts to pay, her health conditions, or her lack of income (which was also exhibited by what JCS included, and did not include, in the probation revocation notice it gave her).

ii.    Plaintiff Rodney Ware

113.    Plaintiff Rodney Ware is a 45-year-old African-American man who resides in Clanton, Alabama. Mr. Ware has resided in Clanton for most of his life, and currently lives with his wife and son. He is very invested in his community and coaches his son's football team.

114.    Mr. Ware received tickets for speeding and for driving without insurance on December 29, 2010. He appeared in Clanton Municipal Court on March 22, 2011, and pled guilty on these charges. He was assessed $340 in fines and $297 in court costs, for a total amount of $637.

115.    While in court, Mr. Ware was worried that he would be sent to jail immediately, as he had been told by friends and family that this happens in Clanton Municipal Court if you cannot pay.

116.    Mr. Ware did not have an attorney to represent him at this hearing, and Judge Jackson did not ask if he wanted an attorney appointed for him.

22

117.   Mr. Ware was asked by Municipal Court Judge Jackson if he would be able to pay the entire amount that day, or if he would prefer a payment plan.   Judge Jackson made no inquiries into Mr. Ware's ability to pay, and did not offer him an option of community service.

118.   Mr. Ware stated that he did not have enough money and thus would need a payment plan. Judge Jackson referred Mr. Ware to JCS. Judge Jackson did not discuss the terms of being assigned to JCS, did not explain that the Order of Probation would require an additional monthly payment of $40 (plus an initial $10 set-up fee) or explain that he was being put on "probation." Judge Jackson did not speak to Mr. Ware again on that day.

119.   Mr. Ware went, as directed, to speak to JCS. He met with an employee from JCS and the Municipal Court Clerk in the Clanton Municipal Court building. Neither person asked Mr. Ware anything about his income, resources, or costs and expenses. They told him that he would have to pay $145 per month. Neither person told him that the monthly amount could be set lower or that the fee could be waived, depending on his ability to pay.

120.   The JCS employee told Mr. Ware to sign the Order of Probation, and he did so.

121.   The JCS employee told Mr. Ware to report to JCS's office in Columbiana for his first appointment on March 29, 2011. The office was approximately 30 minutes from Clanton and 20 minutes from his workplace.

122.   The JCS employee told Mr. Ware that JCS could revoke his probation if he missed an appointment or payment. The order of probation that he was given also states, "You are subject to arrest for violation of any condition imposed by this order, and your probation may be revoked accordingly."

123.   Mr. Ware came to his first appointment on March 29, 2011, with the $50 that he was able to pull together in that week by skimping on other expenses like gas for his vehicle.

JCS applied $40 to their own probation fees and only $10 to his court costs. They set him another appointment in a week and a half, and told him to bring more money.

124.   In May 2011, JCS moved to its current location in Jemison—about 20 minutes from Mr. Ware's job. Though the office location changed, the general practices were the same, and many of the staff were the same. Mr. Ware reported to the Jemison office after it opened.

125.   Mr. Ware would often be told to report every week, as he was not able to bring a full payment each time. JCS employees often applied his first payments towards their own fees, as they did at his initial appointment.

126.   Mr. Ware finished his payments to JCS on the two traffic tickets in September 2011.

127.   Later that same month, in September 2011, Mr. Ware contacted the Clanton Municipal Court. He had received a check in the mail made out to him for $988.50 that purported to be a legitimate grant, as had some of his family and friends, but in fact was a scam. He cashed it in approximately July 2011, hoping to use the much-needed assistance to catch up on JCS payments, as well as other outstanding bills that had been neglected while he was trying to pay JCS. He had since learned that the checks were fraudulent and that the others who had cashed these checks were being charged with misdemeanors. He called, and then went to the Municipal Court to inquire about how he should proceed in repaying the money and avoid an arrest or conviction.

128.   The Municipal Court Clerk informed Mr. Ware that he could repay the $988.50 check, a $30 bad check fee, and a $100 collection fee to avoid prosecution. He informed the clerk that he did not have the money to pay that day, and she told him that he could pay JCS instead. Though he was not sentenced, he was put on "pay-only probation" with JCS and told

again to pay JCS a monthly fee of $40 and a $10 set-up fee.

129.    He finished this probation term in November 2012.

130.    Because of these two probations, Mr. Ware was forced to report regularly to the JCS office for over one and a half years, between March 2011 and November 2012. He paid JCS approximately $820 over that time.

131.    When he would report, JCS employees required Mr. Ware to sign in when he arrived, and he would be told to wait in the waiting room with many other persons on probation before he was called back to meet with a JCS employee.

132.    While waiting in the waiting room for his appointments, often for 20 minutes or more, he would see Defendant Raymond threaten other persons on probation. On multiple occasions, Defendant Raymond called the police, let them in the back door, and had them arrest individuals while they were waiting to be called back for their appointment. Defendant Raymond would also carry around a pair of handcuffs, which he would visibly display to persons who were waiting in the office. These events reinforced Mr. Ware's belief that if he did not pay what was demanded, he could be incarcerated.

133.    The actual appointments with the JCS employees—excluding the 20-minute waiting period—were always brief. The JCS employee would usually ask something like, "How much do you have to pay today?" The employee would not ask any questions about his life, his financial situation, or why he was struggling to make payments. The employee would tell him to bring more money while threatening to bring him back to court if he did not pay. The employee would then give him a receipt, which would have his next appointment date.

134.    Mr. Ware heard from many others on probation with JCS that going back to court meant going to jail. People told him that Defendant Raymond would tell the court you were not

paying or showing up, even if you had been trying, and that the court always sided with JCS. Neither JCS nor the court ever explained that, if he went back to court, his ability to pay would be a critical issue in the proceeding, and that he could not go to jail if he was unable to pay the amount owed despite his best efforts to get that money.

135.    During the time he was reporting to JCS, Mr. Ware was working in Calera, operating a forklift. Mr. Ware worked until approximately 4:00 p.m. every weekday, and sometimes later if cleanup took longer than normal. It was hard for him to make it to either the Columbiana or Jemison JCS office before they closed, and he would often have to try to leave early from work. Mr. Ware asked JCS to give him later appointments because of his work schedule, but JCS employees told them that they could not help him by altering the time. He sometimes had to ask his wife or mother to drive to the office to make payments for him. The official hours of the office were initially until 5:00 p.m., and later until 4:30 p.m., and when he would go himself and arrive at 4:10 or 4:15 p.m., he would often find the doors locked. One time, he arrived around 4:00 p.m. and the outside door was open, so he went into the waiting area. He and others there that day could hear JCS employees in the back of the office, but the JCS employees refused to see him because he arrived too late.

136.    JCS would call his employer when he was not able to make his appointments or payments. When he would try to call back, he was rarely able to speak with anyone. Often, he would reach a pre-recorded message saying that they were unable to reschedule appointments over the phone.

137.    During this time, Mr. Ware and his wife were struggling financially. His wife lost her job in October 2011, and was receiving unemployment through December, when she found a job at a fast food restaurant. Mr. Ware and his wife were working to support themselves and two

26

dependent children living with them, while Mr. Ware also paid child support for two other children.

138.   JCS never told Mr. Ware that he could request a lower payment from JCS or the Court. JCS ever explained that, if he went back to court, his ability to pay would be a critical issue in the proceeding, and that he could not go to jail if he was unable to pay the amount owed despite his best efforts to get that money.

139.   Mr. Ware felt that he had to pay the full amount owed, including the $10 set-up fee and $40 monthly fee to JCS, because he feared he would likely be incarcerated if he did not keep up with his payments. Incarceration would have been devastating, as he would have risked losing his employment if that had occurred. To ensure that he was able to satisfy JCS, as well as to pay for the gas to get to their offices every week, Mr. Ware took extraordinary and financially damaging steps, including skipped paying power bills and making partial payments on many bills; going without lunch while at work; and taking out high-interest loans to try to make ends meet.

140.   Mr. Ware eventually was forced to file for Chapter 13 bankruptcy in April 2012, in the middle of his second probation period.

iii.   Plaintiff Edward "Tylee" Williams

141.   Plaintiff Edward "Tylee" Williams is a 29-year-old African-American man who resides in Clanton, Alabama. Mr. Williams has resided in Clanton for the last three years, and has family who has lived in Clanton for a long time.

142.   Mr. Williams appeared in the Clanton Municipal Court on May 6, 2014, and pled guilty to tickets related to speeding and to having an open container in the car. Municipal Court Judge Jackson sentenced him to a fine and costs of $275, and asked Mr. Williams if he wanted to

pay the fine that day or instead be put on a "payment plan." Judge Jackson offered no other alternatives, such as community service. Mr. Williams requested the payment plan.

143. Judge Jackson did disclose that this would require a payment of $140 per month—which was more than half of the $275 that Mr. Williams said he could not pay on that day. Judge Jackson did not ask Mr. Williams anything about his income, resources, or costs and expenses, and did not tell him that the monthly amount could be set lower or that the fee could be waived, depending on his ability to pay. Judge Jackson did not discuss any of the terms of being assigned to JCS, did not explain that the Order of Probation would require a $40 monthly payment to JCS, did not explain that there would be an initial $10 set-up fee, and did not explain that he was being put on "probation." Judge Jackson did not speak to Mr. Williams again on that day.

144. Mr. Williams did not have an attorney to represent him at this hearing, and Judge Jackson did not ask if he wanted an attorney to be appointed for him.

145. Mr. Williams was then taken by a bailiff to the office of JCS in the courthouse. He met with JCS employee Ms. Hamby, who told Mr. Williams that he would have to pay $140 per month, and that he would have to go to the JCS office in Jemison for his first appointment in one week, on about May 13. Ms. Hamby filled out the Order of Probation, and had Mr. Williams sign it. The form stated that Mr. Williams must pay $140 per month (plus an additional $10 initial fee), must report as instructed to JCS, and provided that "You are subject to arrest for violation of any condition imposed by this order, and your probation may be revoked accordingly."

146. Ms. Hamby did not ask Mr. Williams anything about his income, resources, or costs and expenses, and did not tell him that the monthly amount could be set lower or that the

fee could be waived, depending on his ability to pay.

147.   Mr. Williams reported to the Jemison JCS office as directed on May 13, and brought a payment of at least $120. Mr. Williams struggled to make this payment, as at the time he was earning below minimum wage doing odd jobs on a chicken farm. Despite his meager income, he paid this money because he thought that if he did not do so he could be arrested and put in jail. JCS sent $80 of this to the Municipal Court, keeping the remaining amount for Mr. Williams' probation fee.

148.   Mr. Williams continued reporting to the JCS Jemison office, but he had no money to continue making payments because he was between jobs, or was making very little income from a position acquired through a temp agency. He eventually stopped reporting because the only thing he was told by JCS when he did report was that he had to bring in more money or he would be in violation of his probation, and he did not have any money to bring in.

149.   JCS sought to have Mr. Williams' probation revoked on June 20, 2014. In the petition seeking revocation, JCS stated that $195 was still outstanding on Mr. Williams' tickets. JCS did not report anything to the Municipal Court about Mr. Williams' income or ability to pay, nor anything about the total amount JCS had collected for itself.

150.   Mr. Williams did not receive notice of the hearing on the petition to revoke his probation.

151.   On July 15, 2014, Municipal Court Judge Jackson revoked Mr. Williams' probation after Mr. Williams failed to appear in court. Judge Jackson signed an arrest warrant for Mr. Williams, specifying a cash bond of $195.

152.   Mr. Williams was arrested on July 19, 2014, and held in the Chilton County Jail. He remained in the Chilton County Jail for three days, until July 22, 2014.

153.    On July 22, Mr. Williams was given credit for the three days he had served, totaling $150 toward the $195 he then owed. Mr. Williams' girlfriend paid the remaining $45 to obtain his release. In order to obtain this money, Mr. Williams' girlfriend had to borrow money from multiple members of her family, who were also struggling to survive on small incomes.

154.    On July 22, while still incarcerated, Mr. Williams also pled guilty in Clanton Municipal Court on two tickets for driving with a suspended license and a ticket for speeding. The total fines, fees, and costs were $1,332, plus an additional $450 for failing to appear previously on these tickets. Mr. Williams did not have an attorney to represent him at this hearing, and Judge Jackson did not ask if he wanted an attorney to be appointed for him.

155.    During this hearing, Judge Jackson again asked Mr. Williams if he would pay the full amount that day or use a payment plan. Mr. Williams, having no ability to pay the full amount and already serving time in jail for not being able to pay his last ticket, again selected the payment plan. He was told to report to JCS in Jemison on about July 29.

156.    Mr. Williams reported on about July 29 to JCS. He was required by JCS to pay $140 per month, plus a $10 set-up fee. He paid $120 that day. Mr. Williams could not afford this, and was able to pay this money only by discontinuing his cell phone, which was his only consistent means of communication with his employer and family. He paid this amount because he feared that if he did not do so he would be jailed, as he had been before. JCS accepted this payment, taking for itself the $10 set-up fee and the $40 monthly fee, and crediting the remaining $70 to Mr. Williams' court debts. JCS did not ask him any questions about his income or employment, it simply accepted his money, told him it was not enough, and told him when to report next. Because Mr. Williams did not pay the full amount, he was ordered to report again on August 8, and was directed to bring with him a full payment for that month.

30

157.   Mr. Williams reported again on August 8, paying the full $140.   Mr. Williams could not afford this, and was able to pay this money by falling behind on other bills and continuing to live with his paternal grandmother in order to combine finances to save on expenses. He paid this amount because he feared that if he did not do so he would be jailed, as he had been before.   JCS did not ask him any questions about his income or employment; it simply accepted his money and told him to report a month later.

158.   Mr. Williams was not able to keep up these large payments, and started making smaller payments from $10 to $50.   This amount was still a substantial hardship for Mr. Williams, who continued to struggle to make ends meet in order to make these payments.

159.   When Mr. Williams made these smaller payments, he asked his girlfriend to bring the money to JCS on his behalf. Mr. Williams did so because he feared that he would likely be arrested and jailed if he showed up himself, because he was not paying the full amount JCS demanded.   JCS always accepted the smaller payments, keeping about half of this money for itself and transferring the remainder to the Municipal Court.   But finally JCS told his girlfriend that Mr. Williams had to report himself to JCS or else he would be sent back to court and be incarcerated.

160.   When Mr. Williams appeared himself, he was repeatedly told that he would have to pay more, or else he would be sent back to court and to jail.   Mr. Williams believed these threats because he had been jailed before, and knew of others who had been incarcerated for not paying their tickets.

161.   During his time on JCS, Mr. Williams was never told that he could lower his payment or seek to have the JCS fee waived because of his dire financial status, even though he told JCS employees that he was working but had very limited income.   JCS never offered Mr.

31

Williams assistance in finding a better job. JCS never even informed Mr. Williams of the existence of a job board in their offices.

162.   During his time on JCS, Mr. Williams felt compelled to pay the set-up fee and the monthly fee charged by JCS, out of fear that if he did not do so, he would be incarcerated, as he was one time. He further feared that if he did not pay the amount owed, that JCS would initiate a probation revocation hearing against him (which they did do one time), and that at that hearing JCS would not tell the Judge anything about his efforts to pay or his lack of income.

163.   In the past 7 months, from July 2014 through January 2015, Mr. Williams was able to scrape together $525 in payments toward the Clanton Municipal Court. In the same time, he was compelled to pay $280 in payments to JCS.

164.   Mr. Williams remains on JCS, still must pay JCS $40 per month, and still owes the Municipal Court $1,257.

165.   In early 2015, Mr. Williams injured his Achilles tendon. As a result of this, JCS finally permitted Mr. Williams a slight reprieve; JCS still required Mr. Williams to report regularly, but so long as he brought in a note from the doctor showing that he was continuing to get treatment, JCS ceased collecting fees from Mr. Williams. However, Mr. Williams was never given such an option solely because of his inability to pay.

## V.      **CLAIMS FOR RELIEF**

### **FIRST CLAIM FOR RELIEF**
DAMAGES
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
18 U.S.C. § 1962(c) & (d)
*Plaintiffs versus Private Probation Defendants*

166.   Plaintiffs re–allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

32

167. Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68 ("RICO"), are brought against the Private Probation Defendants.

168. Plaintiffs are "persons" with standing to sue within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

169. Defendant JCS is a "RICO person" within the meaning of 18 U.S.C. § 1963(1) because it is an entity capable of holding a legal or beneficial interest in property.

170. Defendant Raymond is a "RICO person" within the meaning of 18 U.S.C. § 1963(1) because he is capable of holding a legal or beneficial interest in property.

171. This claim for relief is directed against the Private Probation Defendants only and is not directed against Defendant City of Clanton.

### A. The RICO Enterprise

172. The Private Probation Defendants, together with the City of Clanton and the Clanton Municipal Court, constitute an association-in-fact, and therefore an enterprise within the meaning of 18 U.S.C. § 1961(4). Such RICO Enterprise is an ongoing business relationship with the common purposes of maximizing the collection of court fines, court costs, and fees to JCS without consideration of the individual's ability to pay.

173. The RICO Enterprise is engaged in interstate commerce in that its activities and transactions relating to the collection of fines, fees, and costs, and the movement of the profit received by Defendant JCS pursuant to this operation, frequently requires movement and communications across state lines.

174. The members of the RICO Enterprise function as a continuing unit.

175. The Private Probation Defendants have violated 18 U.S.C. § 1962(c) because they are associated with an enterprise (the association-in-fact of the Private Probation Defendants,

together with the City of Clanton and the Clanton Municipal Court) that is engaged in, or the activities of which affect, interstate commerce and have, directly or indirectly, conducted or participated in the conduct of an enterprise's affairs through a pattern of racketeering activity.

176.    The Private Probation Defendants have violated 18 U.S.C. § 1962(d) because they have conspired with each other to violate 18 U.S.C. § 1962(c), as described in the previous paragraph.

177.    Specifically, the Private Probation Defendants conducted or participated in and conspired to conduct the affairs of the RICO Enterprise by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

      a.    Extortion in violation of the Hobbs Act, 18 U.S.C. § 1951;

      b.    Extortion in violation of Ala. Code § 13A-8-13; and

      c.    Extortion in violation of the Travel Act, 18 U.S.C. § 1952.

**B.    Predicate Acts**

Extortionate Acts Generally

178.    The Private Probation Defendants have, on their own and in conspiracy with the other participants in the RICO Enterprise, obtained by threat a $10 set-up fee and $40-per-month probation fee from Plaintiffs, with intent to deprive them of this money.

179.    Specifically, Private Probation Defendants, individually and in conspiracy with the other participants in the RICO Enterprise, threatened Plaintiffs that if they do not agree to pay the set-up and monthly fees that they: (a) will be incarcerated; (b) will have their probation revoked; (c) will be accused by JCS of violating the Order of Probation; and (d) will face testimony by JCS against them regarding non-payment, but without revealing the reasons for non-payment (including an inability to pay).

180.    The threats described in paragraph 179 are inherently wrongful.

181.    The threats described in paragraph 179 are wrongful because they are motivated out of a desire to extort.

182.    The threats described in paragraph 179 are wrongful because, as a matter of law, the fees were being charged pursuant to an illegal contract between JCS and the City of Clanton.

183.    Because of the threats described in paragraph 179, Plaintiffs paid the fees demanded by JCS.

### Extortion in violation of the Hobbs Act, 18 U.S.C. § 1951

184.    Plaintiffs re-allege and incorporate by reference the general Extortionate Act allegations appearing in Paragraphs 178 to 183.

185.    The Private Probation Defendants have, individually and in conspiracy with the other participants in the RICO Enterprise, obtained fees from Plaintiffs with their consent, which consent has been induced by the wrongful use of fear, in violation of 18 U.S.C. § 1951 (Hobbs Act).

186.    The proceeds of Private Probation Defendants' extortionate activities were used in commerce, and therefore affected commerce or the movement of any article or commodity in commerce, as these terms are understood by 18 U.S.C. § 1951(a).

### Extortion in violation of Ala. Code § 13A-8-13

187.    Plaintiffs re-allege and incorporate by reference the general Extortionate Act allegations appearing in Paragraphs 178 to 183.

188.    The Private Probation Defendants have, on their own and in conspiracy with the other participants in the RICO Enterprise, obtained by threat fees from Plaintiffs, with intent to deprive them of this money, in violation of Ala. Code § 13A-8-13.

### Extortion in violation of the Travel Act, 18 U.S.C. § 1952

189.    Plaintiffs re-allege and incorporate by reference the general Extortionate Act

allegations appearing in Paragraphs 178 to 183.

190. The Private Probation Defendants have, individually and in conspiracy with the other participants in the RICO Enterprise, obtained by threat fees from Plaintiffs, with intent to deprive them of this money, in violation of 18 U.S.C. § 1952 (Travel Act) and Ala. Code § 13A-8-13.

191. The Private Probation Defendants have traveled in interstate commerce, and have used the mail and facilities in interstate commerce to distribute the proceeds of the extortionate scheme, specifically by operating a corporate entity (JCS) that is based outside of Alabama but is operating the extortionate activities described herein within Clanton, Alabama, in violation of 18 U.S.C. § 1952(a)(1).

The Private Probation Defendants have traveled in interstate commerce, and have used the mail and facilities in interstate commerce to otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of an extortionate scheme, specifically by operating a corporate entity (JCS) that is based outside of Alabama but is operating the extortionate activities described herein within Clanton, Alabama, in violation of 18 U.S.C. § 1952(a)(3).

### C. **Pattern of Related Racketeering Acts**

192. The Private Probation Defendants and the other participants in the RICO Enterprise have engaged in the racketeering activity described in this Claim repeatedly starting in about February 2009 and continuing through the present with respect to thousands of criminal defendants in the Clanton Municipal Court. These racketeering acts are part of the enterprise's regular way of doing business.

193. The Private Probation Defendants and the other participants in the RICO

36

Enterprise, through the RICO Enterprise, relied on the racketeering acts described in this Complaint to conduct the regular business activities of the RICO Enterprise.

194.    The racketeering acts of the Private Probation Defendants and the other participants in the RICO Enterprise have a similar purpose: to maximize the collection of court fines, court costs, and fees to JCS without consideration of the individual's ability to pay.

195.    The racketeering acts of Private Probation Defendants and the other participants in the RICO Enterprise have yielded similar results and caused similar injuries to Plaintiffs: Plaintiffs have, *inter alia*, all been subjected to fees paid to Defendant JCS as a result of Private Probation Defendants' unlawful conduct.

196.    As set forth in the preceding paragraphs, the racketeering acts have similar participants: Private Probation Defendants and the other participants in the RICO Enterprise.

197.    As set forth in the preceding paragraphs, Private Probation Defendants and the other participants in the RICO Enterprise, through the RICO Enterprise, directed their racketeering activities at similar victims: Plaintiffs specifically, and also more generally all Clanton Municipal Court defendants who cannot afford to pay the entirety of their fines, fees, restitution, and costs on the date that they are adjudicated and assigned fines, fees, costs, and restitution.

198.    As set forth in the preceding paragraphs, the racketeering acts of Private Probation Defendants and the other participants in the RICO Enterprise have similar methods of commission, namely: extorting Plaintiffs specifically, and more generally all Clanton Municipal Court defendants who cannot afford to pay their entire fine, fees, restitution, and costs on the date they are adjudicated and assigned, into paying probation fees to JCS.

37

**D.**    <u>Injury</u>

199.    As a direct and proximate result of Private Probation Defendants' and the other participants in the RICO Enterprise's willful, knowing, and intentional acts discussed in this Claim, Plaintiffs have suffered injuries to their property. Plaintiffs have all been subjected to probation fees paid to Defendant JCS, and have been forced to continue paying these fees even when they cannot afford to do so, resulting in economic harm to themselves and their families.

200.    Plaintiffs are entitled to an award of damages in an amount to be determined at trial, including treble damages and attorneys' fees and costs associated with this action.

**SECOND CLAIM FOR RELIEF**
DAMAGES
ABUSE OF PROCESS
*Plaintiffs versus Private Probation Defendants*

201.    Plaintiffs re–allege and incorporate by reference each and every allegation contained in Paragraphs 1 to 165 as if fully set forth herein.

202.    The Private Probation Defendants abused the process of probation in Clanton Municipal Court by using the probation order granting them authority to supervise probation to extort money from Plaintiffs for their own profit.

203.    The Private Probation Defendants intentionally used the probation orders in this way, by threatening Plaintiffs, failing to give Plaintiffs full information about their due process and other rights, and failing to provide a process for evaluating or presenting indigency to the court when Plaintiffs were unable to pay.

204.    Plaintiffs are entitled to an award of damages in an amount to be determined at trial, including punitive damages.

38

**THIRD CLAIM FOR RELIEF**
DECLARATORY AND INJUNCTIVE RELIEF
VOIDING JCS-CLANTON CONTRACT AS AN UNCONSTITUTIONAL EXCLUSIVE
FRANCHISE
*Plaintiffs versus Contract Defendants*

205.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 to 165 as if fully set forth herein.

206.    The contract between JCS and the City of Clanton grants an exclusive franchise for provision of probation services.

207.    The contract was not competitively bid, as required by Ala. Const. Art. I, § 22 and Ala. Code 1975, § 41–16–50.

208.    Because the contract was not bid, it is void and unenforceable.

209.    Plaintiffs are entitled to a declaration that the contract is void and unenforceable.

210.    Plaintiffs are entitled to permanent injunction enjoining enforcement of the contract.

**FOURTH CLAIM FOR RELIEF**
DECLARATORY AND INJUNCTIVE RELIEF
VOIDING JCS-CLANTON CONTRACT AS AGAINST PUBLIC POLICY
*Plaintiffs versus Contract Defendants*

211.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 to 165 as if fully set forth herein.

212.    The contract between JCS and the City of Clanton violates public policy because it requires the charging of a probation fee, in direct contradiction to state law which does not permit a probation fee in municipal court.

213.    Municipal courts may only impose monetary penalties of fines and court costs, and only those that are expressly provided by law. Ala. Code §§ 11-45-9(a), 12-19-153(a). The probation statute does not authorize such a fee to be charged. Ala. Code § 12-14-13(d).

214. Because the contract violates public policy, it is void and unenforceable.

215. Plaintiffs are entitled to a declaration that the contract is void and unenforceable.

216. Plaintiffs are entitled to permanent injunction enjoining enforcement of the contract.

## VI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

a. Declaratory and injunctive relief;

b. Compensatory damages;

c. Treble damages as authorized by RICO, 18 U.S.C. § 1964(c);

d. Punitive damages;

e. An award of prevailing party costs, including attorney fees; and

f. Such other relief as the Court deems just and appropriate.

**TRIAL BY JURY IS DEMANDED ON FIRST AND SECOND CLAIMS FOR RELIEF.**

DATED this 12th day of March, 2015

Respectfully submitted,

/s/ Samuel Brooke
*On Behalf of Plaintiffs' Counsel*

Samuel Brooke (ASB-1172-L60B)
Sara Zampierin (ASB-1695-S34H)
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, Alabama 36104
Telephone: (334) 956-8200
Fax: (334) 956-8481
samuel.brooke@splcenter.org
sara.zampierin@splcenter.org
**Attorneys for Plaintiffs**